**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**James Delbert FINGERS, Jr.,**
**Defendant-Appellant.**

No. 10728.

Missouri Court of Appeals,
Southern District,
Division Two.

July 10, 1979.

Motion for Rehearing or Transfer
Denied July 16, 1979.

Application to Transfer Denied
Sept. 11, 1979.

Loren R. Honecker, Springfield, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Daniel F. Lyman, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

A jury found defendant James Delbert Fingers, Jr., guilty of robbery in the first degree as defined and denounced by former § 560.120, RSMo 1969, V.A.M.S.[1] The Second Offender Act, former § 556.280, V.A.M.S., was found to be applicable, and defendant's punishment was fixed at imprisonment for a term of 18 years. Defendant appeals.

On February 4, 1976, about 8:00 p. m., two men came upon the premises of the Pasco Service Station in Springfield, Missouri. Robert Havens was the attendant on duty at the station. Havens was in the process of replacing cigarettes in a vending machine, heard the men enter, "turned thinking they were just a customer" and confronted the two men, one of whom told Havens "that he wanted the money or he'd kill [Havens]." Havens described the two men, one of whom (defendant) was "male, Caucasian, had hair . . . down toward the shoulders." This man was about 5'9" tall, weighed between 160 and 170 pounds, and appeared to be "around" 25, 27 years of age, "somewhere around in there." The other man, or boy, was also a male Caucasian, "blond, light-colored hair," "about five feet tall, about [13] or [14] years old." Havens immediately recognized the older man as a person who attempted to rob the service station previously.

Havens refused the robbers' demand. He attempted to leave the premises, but was seized and restrained by the defendant. The defendant told his accomplice, who he addressed as "Rodney," to "find something to hit [Havens] with"; Rodney found the "handle to a squeegee [used] to clean windows."[2] Rodney struck Havens a number of times with the squeegee handle; the robbers noted that their attack was ineffectual, and Rodney was ordered ". . . to find something else to stab [Havens] with." Rodney found a screwdriver and attempted to stab Havens while defendant held Havens "[i]n a bear hug." Rodney was

1. Which read, in pertinent part: "[E]very person . . . who shall be convicted of feloniously taking the property of another from the person of his . . . servant, clerk or agent, in charge thereof and against the will of such . . . servant, clerk or agent by violence to the person of such . . . servant, clerk or agent, . . . shall be adjudged guilty of robbery in the first degree." Former § 560.135, RSMo 1969, V.A.M.S., provided that the punishment for first-degree robbery not involving use of a dangerous and deadly weapon was imprisonment for not less than five years in the penitentiary.

2. The "squeegee handle," in evidence here as State's exhibit 1, is essentially a black plastic cylinder about 16" long. It is threaded at one end; the other end is molded into a grip resembling the grip of an ordinary square-bar screwdriver. The circumference of the grip is about 4"; that of the shaft is about 3". The gross weight of the "squeegee handle" is 3½ oz.

instructed to find "something to tie [Havens] up with"; Havens' feet were bound with a length of garden hose, and finally, in Havens' words, "[t]hey held me down . . . and the defendant had the screwdriver holding it at my neck saying, 'Give me the keys or I'll run this in.' I said, 'O.K.' "

Havens told the defendant where the cash receipts were, "exactly," and defendant "went in and got it" while Rodney sat on Havens and held the screwdriver to Havens' neck. Defendant and Rodney took $500 to $600 belonging to the service station and Havens' wallet which contained about $74.

The State also had evidence from David Oetting, manager of the service station. Oetting testified that attendants at the station normally kept cash receipts in their wallets until an unwieldy amount accumulated, at which time the receipts were secreted at locations selected by the individual attendants. Oetting further testified that defendant had worked for him at the Pasco Service Station from September 1974 until February 1975, and was familiar with Oetting's method of handling cash.

Two points are advanced on appeal. They are: 1) that the trial court erred in failing to suppress and in receiving State's exhibit 7—an everyday white plastic hard hat—because the exhibit was the product of an unlawful search and seizure, and 2) that the trial court abused its discretion in receiving evidence of defendant's attempt to rob the Pasco station in December 1975, because the prejudicial effect of such evidence far outweighed its probative value. We review only the allegations of error briefed on appeal. Rule 28.02, V.A.M.R.

The first assignment of error is overstated, but requires some discussion. There was evidence that in December 1975, the defendant had attempted to rob the Pasco station. Havens recalled the incident. He remembered that the would-be robber had worn a white uniform and a white hard hat. Havens struggled with the aspiring robber, who finally fled. In flight, the man dropped his hard hat, but "turned and picked it up like he needed it for work." When the defendant appeared on the date of the completed robbery, Havens recognized him as the person who had attempted to rob him earlier. Specifically, Havens remembered the defendant's concern for his hard hat.

One Brinkman, an experienced police officer, testified at the suppression hearing. Brinkman had investigated both the attempted robbery and the completed robbery. When the attempted robbery occurred, Brinkman ". . . had the suspect's description . . . and part of the description [was] that the suspect was wearing a white, plastic helmet." Brinkman also discussed the identity of the robbers with Havens after the completed offense was committed. Havens then advised Brinkman that two men had participated in the completed offense. One of the men, the older of the two, was the same man who had attempted to rob Havens in December 1975. The older man had addressed his abettor as "Rodney." Havens described Rodney; Brinkman associated the description with one Rodney Rogers.

A day or two after the completed robbery, Brinkman took Rodney in custody at the Rogers residence. A "mustard-gold" colored station wagon was observed parked in the driveway of the Rogers house. The investigating officers were told the station wagon belonged to a member of the Rogers family. The license tag on the vehicle did not "check to" the defendant.

Thereafter defendant was identified from a "mug shot" and officers took him in custody at an automobile auction lot in south Springfield. After the officers took the defendant to jail, they returned to the auction lot. There they found the "mustard-gold" colored station wagon. A white plastic hard hat was detected, inevitably, "In the rear portion [sic] of the vehicle *that was open to public view*." (Emphasis added). A photograph taken prior to the search—it is before us as State's exhibit 1—shows that part of the hard hat was visible to the officers standing outside the vehicle before it was searched. Another of the photo-

graphs taken by officers before they searched the station wagon shows that the vehicle was parked on an asphalt parking lot. A sign immediately behind the station wagon bears the legend "166 Auto Auction. 6000 cars wholesale every day." We should also note that the officers did not, at the time, know who owned the vehicle, but it was not locked. The officers had no search warrant. Brinkman entered the vehicle and seized the hard hat.

▇▇ There is doubt that the assignment of Fourth Amendment error was properly preserved for review. A trial court's ruling on a preliminary motion to suppress is interlocutory, and therefore our inquiry is whether the hard hat was admissible when it was received in evidence. *State v. Howell*, 524 S.W.2d 11, 19[6] (Mo. banc 1975). It is settled, of course, that a timely objection is required to preserve objections for review even when they have a constitutional basis. *State v. Tyler*, 454 S.W.2d 564, 567[2] (Mo.1970). When the hard hat was offered in evidence at the trial, the court inquired of defendant's counsel: "Any objection to State's Exhibit 7?" Counsel contented himself with this reply: "As to the State's Exhibit 7, the white hard hat, objection on the basis of improper foundation and inability of the witness [Havens] to identify the helmet, and further objection that I announced earlier—relevancy and probative value." The trial court specifically stated: "*That* objection is overruled." (Our emphasis). Inasmuch as this appeal is defendant's only appeal of constitutional right, *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), we shall, in the exercise of discretion, examine his point as an assignment of plain error. Rule 27.20(c), V.A.M.R.

▇▇ In his brief, the defendant seeks to condemn the seizure of the hard hat as a violation of the "plain view" doctrine. The plain view principle has limitations; it justifies some warrantless searches and seizures if the officers are lawfully in the place from which the evidence is seen, the discovery is inadvertent, and the item or items seized are immediately recognizable as evidence.

*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Collett*, 542 S.W.2d 783, 786 (Mo. banc 1976). If *Coolidge* were the only precedent construing the Fourth Amendment, we should have trouble with the requirement that the items seized be immediately recognizable as evidence. Officer Brinkman and his companions could see only the top of the white hard hat. The anonymity of the top of any particular white, plastic hard hat is obvious, and such markings and characteristics as indicate exhibit 7 might have been tied to the defendant appear only upon inspecting the interior of the hat, which was concealed when it was seized.

As it is, the *Coolidge* decision does not state all the law concerning the Fourth Amendment, and that case, while it is undoubtedly relevant, is not controlling here. The present state of the law dealing with vehicular searches was admirably put in general terms in *United States v. Helberg*, 565 F.2d 993, 996[1][2] (8th Cir. 1977):

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Supreme Court has insisted upon probable cause as a minimum requirement for a reasonable search. The Court has also generally required that a search be preceded by the judgment of a magistrate on the probable cause issue and by the issuance of a warrant. *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). . . . [h]owever, an exception to the warrant requirement has developed around automobiles. This exception [is] based on two distinct vehicular characteristics: mobility, which may create exigent circumstances rendering a warrant impractical, and the diminished expectation of privacy associated with the automobile. [Citations omitted].

Nevertheless, '[a]utomobile or no automobile, there must be probable cause for the search.' *Almeida-Sanchez v. United States*, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537–38, 37 L.Ed.2d 596 (1973)."

▇▇ General contemporary commentary upon vehicular searches and seizures mir-

rors the Eighth Circuit's view. See Project, Eighth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals, 67 Geo.L.J. 323, 342–344 and nn. 144–151 (1978).[3] Here, we have no difficulty whatever in finding both a diminished expectation of privacy and the exigent circumstances required for a warrantless search. The "mustard-gold" colored station wagon was not locked nor parked on private premises nor even in a reserved parking slot. It was parked on a lot accessible to many persons. Neither do we have difficulty in finding exigent circumstances. The officers were not sure who owned the car; they had seen it at the abettor's residence earlier but were unable to discover registration records linking it directly to the defendant or his abettor, and the vehicle was parked on an automobile auction lot which publicly advertised the sale of 6000 automobiles daily. There was, from the officers' standpoint, every likelihood of movement of the vehicle.

■ Did the officers have probable cause to search the station wagon? We believe the record justifies a finding they did. At the suppression hearing, officer Brinkman testified that the vehicle was the same color as the station wagon seen in Rodney's driveway; other distinctive markings also appeared and were noted. It was reasonable to suppose it had been used by the defendant or Rodney in the commission of the robbery. A casual glance showed the vehicle contained a white hard hat, and the officers, having obtained a positive identification of the defendant as the robber and information that one of the participants had a hard hat which he apparently used in his work, had probable cause to search. We conclude and hold that there was no plain error in admitting the hard hat on the grounds urged here.

■ The defendant's other point is that the trial court erred in admitting evidence of the defendant's attempted robbery because such evidence amounted to an attempt to prove the commission of the completed robbery by proof of a separate, distinct offense. Defendant readily concedes such evidence is competent to prove the specific crime if it tends to establish motive, intent, common scheme or plan, or identity of the person charged with the commission of the crime on trial. State v. Mitchell, 491 S.W.2d 292, 295[1] (Mo. banc 1973). We do not agree with the State's contention that the defendant's identity was the crucial issue on trial, but it was an issue. Rodney's identification of the defendant as the perpetrator of the robbery was most equivocal, and by trial time, the defendant had let his hair grow long and had gained weight. Consequently, his appearance on trial was somewhat different from his appearance in the "mug shot" from which he was identified. The point is briefed only as an abuse of discretion. An abuse of judicial discretion is an act which is untenable, clearly against reason and which works an injustice. State v. Stubenrouch, 499 S.W.2d 824, 826[6] (Mo.App.1973). The trial court's admission of evidence of the attempted robbery was not, in the detailed circumstances, such an act.

We find no prejudicial error in any respect briefed or argued in this court. Accordingly, the judgment is affirmed.

BILLINGS, C. J., concurs.

YEAMAN, CONLEY and RAGLAND, Special Judges, concur.

---

**3.** Many of the recently reported cases deal with the seizure of "contraband," i. e., drugs or weapons. Some precedents strongly indicate, however, that given the existence of probable cause, the officers may seize other items linking the defendant to the offense charged. See, e. g., Texas v. White, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (seizure of checks similar to those defendant had attempted to pass); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (seizable items include clothing).