STATE of Missouri, Respondent,

v.

Ralph L. MILLER, Appellant.

No. 76803.

Supreme Court of Missouri,
En Banc.

Feb. 21, 1995.

**650**

Raymond L. Legg, Janet M. Thompson, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

THOMAS, Judge.

## I.

Ralph L. Miller appeals his conviction for possession of cocaine. Appellant claims (1) the stop of the vehicle in which he was a passenger was constitutionally impermissible; and (2) the consent of the driver of the vehicle to a search of her person and the car did not purge the taint of the initial illegality and, therefore, evidence of the cocaine found on appellant's person and appellant's post-arrest statements must be suppressed.

Once again we must determine the appropriateness of police and prosecutorial behavior in light of a citizen's right to be free from unreasonable searches and seizures and society's need for effective law enforcement. Our safety and freedom are at odds in the field of the Fourth Amendment to the United States Constitution and Article I, Section 15 of the Missouri Constitution. This is a diffi-

cult line to draw, and it is not made any easier by the fact that we must again do so in the factual context of an individual who has violated the law. We reverse appellant's conviction and order the trial court to sustain his motions to suppress because the initial police stop was illegal and the subsequent search activity was not sufficiently attenuated to purge the initial taint.

## II.

### FACTS

On December 27, 1991, Detective Himmel called Officer Thomas on his portable telephone in regard to narcotics being transported in the area of the Rainbow Village Trailer Court in Columbia, Missouri. Officer Thomas later relayed the information in person to Officer Robinson. Officer Robinson was told that a red Nissan Sentra, belonging to Ramona Tope, with Missouri license plate No. VJS976, would be transporting controlled substances and that the car would be located in the vicinity of the Rainbow Village Trailer Court because appellant lived in that area. Officer Robinson, Officer Thomas, and Detective Himmel all were members of a special unit of the Columbia Police Department charged with suppression of street level drug trafficking. Because Detective Himmel did not testify at the suppression hearing, it is not known how Himmel knew or suspected the car would be transporting narcotics.

Officer Robinson asked for and received assistance from Officer McDonald, who also was a member of the special drug unit. Officers Robinson and McDonald met in the vicinity of Rainbow Village and, just northeast of the trailer court at around 7:15 p.m., stopped a vehicle matching Himmel's description. Tope was the driver and appellant was a passenger in the right front seat.

Officer Robinson approached the driver's side of the vehicle, asked Tope to exit the vehicle, explained to her the reason for the stop, and, after Tope exited the vehicle, asked for her consent for a search of her person and the car. Tope asked if she would be arrested if she refused to consent and Officer Robinson answered that she would not. Contemporaneously, Officer McDonald

approached the passenger side of the vehicle and explained to appellant that he and Robinson were going to search the car for narcotics. McDonald then asked appellant for identification. Sometime during the following activity between McDonald and appellant, Robinson received consent from Tope to search the car and communicated that consent via a previously arranged for nod to McDonald.

Appellant did not respond to the initial request for identification, became very agitated, and kept asking McDonald what was going on. When appellant continued to refuse to produce identification, he was asked to step out of the car. Appellant acted as though he had not heard McDonald's request and curiously placed his left hand in the left pocket of his jeans. His hand remained in his pocket for 15 to 20 seconds until he finally stepped out of the car. McDonald then noticed that appellant slipped his hand out of his pocket in an attempt to keep McDonald from seeing what was in his hand. McDonald saw a small yellow object partially concealed in appellant's fist. Appellant initially said that he had nothing in his hand and then, after being told by McDonald not to throw it on the ground, placed the object in his left coat pocket. McDonald reached into the pocket and retrieved a small yellow bowl containing cocaine residue.

Appellant was arrested. While on the way to the police station, he denied that the container contained cocaine, but later said, "Well, what if it is coke? I thought you had to have a lot more than that to get in trouble." Appellant then asked about the source of the police's information regarding the drugs. McDonald answered that he did not know who provided the information. Appellant then volunteered, "I know who it was, an old girlfriend. She's jealous, she said she would get me busted.... She's a whore. She works in a massage parlor as a prostitute, she's just jealous."

Appellant filed dual motions to suppress the admission of both the post-arrest state-

ments and the evidence of the cocaine found on his person. At the suppression hearing, the State only offered testimony from Officers Robinson and McDonald. Neither Officer Thomas nor Detective Himmel testified. The trial court denied appellant's motions to suppress. At trial, the State and the defense stipulated to the admission of the testimony of the two officers subject to appellant's objection that the search and seizure were illegal. Appellant was convicted, the conviction was upheld by the Court of Appeals, Western District, and this Court accepted transfer.

This Court is to affirm the trial court's decision if the evidence is sufficient to sustain its finding. *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990). Likewise, this Court will defer to the trial court's evaluation of the *credibility of the witnesses and the weight of the evidence*. *State v. Villa–Perez*, 835 S.W.2d 897, 902 (Mo. banc 1992). We find the trial court erred in overruling appellant's motions to suppress and, therefore, we reverse and remand.

## III.

### THE VALIDITY OF THE STOP

■ The Fourth Amendment of the United States Constitution preserves the right of the people to be secure against unreasonable searches and seizures. Generally, a search or seizure is allowed only if the police have probable cause to believe the person has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The Fourth Amendment allows, however, a so-called *Terry* stop, which is a minimally intrusive form of seizure or "semi-arrest" that is lawful if the police officer has a reasonable suspicion supported by articulable facts that those stopped are engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[1] Police are allowed to conduct *Terry* stops of moving vehicles upon a reasonable suspicion that the occupants are involved in criminal activity. *United States*

---

1. The *Terry* stop is a de minimis intrusion on the liberty of a person and is designed to advance officer safety. The scope of such a stop, which must be based on reasonable suspicion, must be reasonably related "to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

*v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).[2] The permissible scope of a *Terry* automobile stop includes a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden. . . ." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983).

When a law enforcement officer effectuates a *Terry* stop, he need not have personally observed facts amounting to reasonable suspicion provided he acted on information provided by another officer who is shown to have had reasonable suspicion to make the stop. *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *Hensley,* the Supreme Court created a three-part test that requires the following: (1) that the communication objectively supported the action taken by the officer; (2) that the communication was issued on the basis of a reasonable suspicion that the occupant of the vehicle had been involved in a crime; and (3) that the stop that in fact occurred was no more intrusive than would have been permitted the officer that originally communicated the information. *Id.* at 232, 233, 105 S.Ct. at 682, 682.

In *State v. Franklin,* 841 S.W.2d 639 (Mo. banc 1992), this Court had occasion to apply the *Hensley* test in a factually similar case.[3] In *Franklin,* a Kansas City police officer received a radio dispatch stating that an armed party was occupying a black 1984 Pontiac Fiero in the area of 4200 East 60th Terrace. The officer saw the black Fiero being driven westbound on 61st Street and pulled the car over. The officer ordered the driver out of the vehicle, handcuffed him, patted him down, and, finding no weapon, felt under the seats of the vehicle and checked the console for a weapon. Still unable to unearth a weapon, the officer asked the driv-

er for his driver's license. When the driver was unable to produce the license, the officer placed the driver under custodial arrest and searched him. The search produced a marijuana cigarette, or "joint," and the officer eventually found two more "joints" and over $37,000 in cash in a brown paper sack upon a more complete search of the car.

In *Franklin,* this Court found it necessary to apply only the second prong of the *Hensley* analysis because there was no evidence that the dispatch was issued on the basis of a reasonable suspicion.

In addressing the second *Hensley* requirement, it becomes clear that the state failed to meet its burden. At a suppression hearing the state bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled. § 542.296.6, RSMo 1986; *State v. Milliorn,* 794 S.W.2d 181, 184 (Mo. banc 1990). The record contains no evidence of a dispatch issued on the basis of reasonable suspicion, and the detaining officer did not personally observe, independent of the dispatch, any behavior that would justify the stop. The dispatcher was not called to testify at the suppression hearing. The record is silent as to the source of the information that lead to the police dispatch. Without that information the court cannot determine whether the dispatch was based upon reasonable suspicion.

*Id.* at 644. We find *Franklin* controlling. Because we cannot simply imbue Himmel's communication with reliability, we must look beyond the communication itself to justify the stop. To determine if reasonable suspicion existed, we must apply one of three standards:

---

2. The State acknowledges that, as a passenger in the vehicle, appellant has standing to contest the legality of the stop. *United States v. Erwin,* 875 F.2d 268 (10th Cir.1989); *United States v. Portwood,* 857 F.2d 1221 (8th Cir.1988).

3. The *Hensley* case involved an officer's reliance on a police flyer. In a radio dispatch case, *State v. Franklin,* 841 S.W.2d 639 (Mo. banc 1992), this Court applied *Hensley* because we found "no

rational distinction between a stop made in reliance on a flyer and a stop made in reliance on a police radio dispatch." *Id.* 841 S.W.2d at 643. Likewise, we find no rational distinction between the *Hensley* and *Franklin* cases and the present case which involves a cellular telephone communication from one officer to another that was later communicated in person to the stopping officer.

If a dispatch is based upon information provided by another police officer, the court looks to whether the collective information known to all officers involved in the stop amounted to reasonable suspicion. If the dispatch is based upon information obtained from an identified informant, courts examine whether the informant was known to the police to be reliable. If the information was obtained from an anonymous informant, the question is whether the police corroborated the details of the tip before making the stop. [Citations omitted.]

*Franklin,* at 644, n. 6.

■ The State produced no evidence of the origin of the tip other than appellant's post-arrest statements. Nonetheless, the State argues that because of appellant's post-arrest statements regarding his belief that his ex-girlfriend had provided the tip, the Court should apply the standard of a known and reliable informant. This standard cannot apply in this case because, as we determine in part IV.B. of this opinion, appellant's statements were obtained as a result of the stop that would otherwise be held illegal. It is a well-worn principle of law that the successes of a search cannot be used to justify its legality. *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948);[4] *State v. Wing,* 455 S.W.2d 457, 460 (Mo.1970). By the same token, a statement obtained as the result of an illegal stop cannot be used to justify the legality of the stop.

Judge Holstein's dissent suggests that the information received from Officer Himmel should be afforded the same reliability as should be afforded a tip from an identified informant. Since such information would be sufficient if it was shown to be from a source known to the police to be reliable (and certainly Officer Himmel should qualify as such), this stop should be viewed as proper. The fallacy in this reasoning is fundamental. It ignores the State's burden of proof to go forward with the evidence to prove the basis of the original officer's reasonable suspicion that the occupants of the vehicle were involved in criminal activity. *§ 542.296.6, RSMo1986.* When such information originates with law enforcement personnel and the State relies on that information to justify the stop, the State must prove the facts giving rise to the original suspicion. The requirements of reasonable suspicion and probable cause would be rendered meaningless if police could simply filter a "hunch" through a radio dispatch or cellular phone and have it come out reliable on the other end.

Therefore, the stop will be held illegal unless the collective information known by the officers involved in the stop, Robinson and McDonald, amounted to reasonable suspicion. *Franklin,* 841 S.W.2d at 644, n. 6. This can be accomplished, however, from the collective information known by the officers involved in the stop given the totality of the circumstances, and reasonable suspicion can be established if Officers Robinson and McDonald independently observed sufficient corroborating information from the prior police communication. *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

In *White,* the Montgomery police department received an anonymous tip that Vanessa White would be leaving a specific apartment building at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would travel directly to a motel located about four miles from the apartment building, and that she would be carrying about an ounce of cocaine inside a brown attache case. The police drove to the apartment building and verified that a woman left within the time frame presumably given in the tip, drove off in a brown Plymouth station wagon with the right taillight lens broken, and drove the most direct route to the motel named in the tip. Although the woman did not have a brown attache case and the Court noted that the case was a close call, the Court held that the police had sufficiently corroborated the information from the tip and, therefore, had rea-

---

4. The Supreme Court has had "frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948).

654

sonable suspicion to stop her vehicle. The Court was not impressed by the information that the car was in front of the apartment building as "[a]nyone could have 'predicted' that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's *future behavior* because it demonstrated inside information—a special familiarity with respondent's affairs." *Id.* at 332, 110 S.Ct. at 2417.

In *White*, the detailed information given and the officer's corroboration of the events allowed the officer to come to the frame of mind that the tip was more than a prank; the tipster had inside information that predicted future behavior. This alone increases the likelihood that the vehicle would be carrying what the tipster said it would such that a *Terry* stop is justified. It is essential, however, that the tip include detailed information that demonstrates a special familiarity with the affairs of the object of the tip.

■ The information in both this case and the *Franklin* case failed to demonstrate a special familiarity with the object's affairs. In both cases, the information merely accurately described a vehicle that might be located in a particular area. In neither case did the information identify who would be in the vehicle, allow for corroboration of a travel route, or give an exact location for the vehicle. The corroboration of a police communication that predicted that a car might, at some undetermined time, be somewhere around appellant's place of residence does not give rise to a reasonable suspicion under the standard set in White. The stop was, therefore, illegal.

It is appropriate to point out that although throughout this opinion we refer to the stop as being illegal, this case really involves the prosecution's failure to prove the legality of the stop as opposed to an affirmative showing of an illegal stop. However, this is how it should be because a *Terry* stop is an extraordinary occurrence which is only justified when the State carries the burden of proving that justification.

## IV.

### THE ATTENUATION DOCTRINE

The State argues that although the initial stop may have been illegal, the illegality became irrelevant when Ramona Tope consented to a search of the car and the cocaine was thereafter found in plain view during the consent search.

■ Generally, evidence discovered and later found to be derivative of a Fourth Amendment violation must be excluded as fruit of the poisonous tree. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). However, there is no steadfast rule that evidence discovered after a Fourth Amendment violation must be excluded.[5] Instead, "[i]n determining whether the exclusionary rule should apply to render evidence inadmissible as 'fruit of the poisonous tree,' the question is 'whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *State v. Lingar*, 726 S.W.2d 728 (Mo. banc 1987) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

### A.

### The Consent

■ The State relies on *State v. Love*, 831 S.W.2d 631 (Mo.App.W.D.1992), for the proposition that Tope's voluntary consent necessarily dissipates the taint of the illegal stop. In *Love*, a police officer pulled over the defendant's vehicle after hearing the tires

5. The attenuation doctrine is one of three limitations on the fruit of the poisonous tree doctrine. The independent source rule provides that facts obtained by illegal police misconduct may be admissible if knowledge of the facts can be proved through a source independent of the illegality. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The inevitable discovery rule provides that information obtained through an unlawful search may be admissible if it is shown that such evidence would have been discovered even if the illegality had not occurred. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

squeal, thinking that the defendant had run a stop sign, and suspecting that the car was stolen. The officer ordered the defendant out of the vehicle, placed him in a "spread eagle" position, and patted him down. After noticing that defendant was trembling, the officer handcuffed defendant and, with the aid of a flashlight, saw a portable telephone and brown plastic bag by the front seat. The officer then asked the defendant to sign a consent-to-search form. By this time, another officer had arrived at the scene, and both officers witnessed the defendant sign the consent form. Crack cocaine was found in the vehicle. The Court of Appeals, Western District, affirmed the trial court's denial of defendant's motion to suppress. The court held that "[s]ince we find sufficient evidence to support the trial court's ruling that defendant's consent to search was voluntary, we need not reach the issue of probable cause for his stop and his arrest." *Id.* at 633.

Of course, the *Love* case is different from the present case. In *Love,* the officer did personally observe the behavior that lead to the stop. The defendant had squealed his tires and the officer believed that he had run a stop sign. To this extent, the *Love* case is distinguishable. To the extent, however, that the *Love* decision stands for the proposition that a voluntary consent obviates the need to analyze the legality of the initial stop and necessarily dissipates the taint of a possible Fourth Amendment violation, it is overruled.

The voluntariness of a consent is important, but it is merely a threshold requirement for the attenuation doctrine. *See United States v. Cherry,* 759 F.2d 1196, 1210, 1211 (5th Cir.1985); *See also Brown v. Illinois,*

422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (voluntariness of confession only threshold requirement for Fourth Amendment analysis). The government must meet the dual requirement of voluntariness and sufficient independence from the prior illegality to purge the taint of that illegality. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Brown v. Illinois, supra; see also United States v. Melendez–Garcia,* 28 F.3d 1046 (10th Cir.1994).[6]

Because we find that the taint of the illegal stop had not been purged by Tope's consent, we can assume for the purpose of our analysis, without deciding as such, that the consent was voluntary.[7]

In *Brown v. Illinois,* the Supreme Court outlined three factors that should be considered in determining whether a confession retains the taint of a prior illegal seizure: (1) the temporal proximity of the illegality and the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. 422 U.S. at 603–04, 95 S.Ct. at 2261–62. These factors should also be applied when determining whether to suppress evidence obtained through a voluntary consent to search given after an illegal stop or arrest. *See United States v. Tovar,* 687 F.2d 1210, 1215 (8th Cir.1982).

The first two factors weigh heavily against a finding of attenuation. There was simply no significant temporal distance between the illegal stop and Tope's consent. The officers immediately told both Tope and appellant that they were searching for narcotics and only moments, or at most minutes, separated

**6.** In *United States v. Carson,* 793 F.2d 1141 (10th Cir.1986), the Tenth Circuit held that a voluntary consent ends the need for further analysis. In *United States v. Melendez–Garcia,* 28 F.3d 1046 (10th Cir.1994), the Tenth Circuit found that *Carson* had blurred the proper analysis and corrected the prior opinion by explicitly holding that a consent must be both voluntary and sufficiently independent from the prior illegality to purge the taint of the illegality. *Id.* 28 F.3d at 1054. We attempt to do the same here. We do so to emphasize the necessity of analyzing both the voluntariness of the consent and the sufficient independence from the prior illegality. This dual

requirement has been blurred by our court of appeals in *State v. Talbert,* 873 S.W.2d 321, 324–25 (Mo.App.S.D.1994), *State v. Riddle,* 843 S.W.2d 385, 387 (Mo.App.E.D.1992), and *State v. Love,* 831 S.W.2d 631, 633 (Mo.App.W.D.1992).

**7.** We do note, however, that although under *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973), the State already bears the burden of proving the voluntariness of the consent, that burden becomes heavier if the consent follows an illegal stop. *United States v. Fernandez,* 18 F.3d 874, 881 (10th Cir.1994).

Tope's consent to search and the illegal stop.[8] *See Florida v. Royer*, 460 U.S. at 507–508, 103 S.Ct. at 1329 (consent tainted when obtained minutes after illegal detention); *Melendez–Garcia*, 28 F.3d at 1055 (consent tainted when only minutes at the most separated the illegal search and consent); *United States v. Fernandez*, 18 F.3d 874, 883 (10th Cir.1994) (consent tainted when it took place only moments after illegal search); *United States v. Campbell*, 920 F.2d 793, 798 (11th Cir.1991) (consent tainted when it was given over an hour after an illegal arrest); *United States v. George*, 883 F.2d 1407, 1416 (9th Cir.1989) (consent tainted when obtained no more than an hour following illegal arrest); *United States v. Maez*, 872 F.2d 1444, 1447 (10th Cir.1989) (taint of illegal arrest not purged where consent form signed thirty minutes after illegal arrest); *contra United States v. Ramos*, 42 F.3d 1160 (8th Cir.1994) (taint purged when only minutes separated consent and illegal detention following legal stop and there were no intervening circumstances).

Also, there were no intervening circumstances as Officer Robinson immediately asked Ramona Tope to step out of the car and give her consent for a search of her person and car. The fact that she was told that she would not be arrested for refusing to consent is not an intervening circumstance sufficient to break the causal chain of events following the illegal stop.[9] This is simply a classic case of the police obtaining the evidence by exploitation of the initial illegality rather than by means sufficiently distinguishable to be purged of the primary taint.

And, while we find no police misconduct such that the third factor could weigh in favor of appellant,[10] the absence of purposeful and flagrant misconduct cannot alone dissipate the taint in the complete absence of temporal distance and intervening circumstances.

■ The final portion of the State's argument regarding the suppression of the cocaine involves the plain view doctrine because the bowl containing the cocaine was seized in plain view after the officers received consent to search the car, rather than as a result of the consent search itself. Because we have held that the consent did not render the initial illegality irrelevant and did not dissipate the taint of the initial illegality, the plain view doctrine does not apply in this case. The plain view doctrine only applies where the officer is lawfully located in a place from which the object can be plainly seen, the officer has a lawful right of access to the object itself, and the incriminating character of the object is immediately apparent to the seizing officer. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990). As we have held, Officer McDonald was not lawfully located in a place where he could plainly see the container. The plain view doctrine is, therefore, inapplicable to the case and appellant's motion to suppress evidence of the cocaine should have been sustained.

### B.

#### Appellant's Post–Arrest Statements

■ The analysis concerning appellant's post-arrest statements about the cocaine and his ex-girlfriend giving the tip is largely the same as with the consent search. Although the statements were made after the consent, they were still made within minutes of the illegal stop and this factor still weighs against a finding of attenuation. Likewise, there are no intervening circumstances that could weigh in favor of attenuation. The fact that appellant was given his *Miranda* warn-

---

8. For other third party consent cases, see *United States v. Maez*, 872 F.2d 1444 (10th Cir.1989), and *United States v. McCoy*, 839 F.Supp. 1442 (D.Or.1993).

9. Intervening circumstances that weigh in favor of attenuation include circumstances where the appellant had been released from custody, made an appearance before a magistrate, or consulted with an attorney, *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1300 (9th Cir.1988),

fact that consent to search is attributable to lawful detention and not an illegal detention, *United States v. Cherry*, 759 F.2d 1196, 1212 (5th Cir. 1985), and independent advent of probable cause, *United States v. Manuel*, 706 F.2d 908, 911–12 (9th Cir.1983).

10. In fact, the problem with this case is more the failure of the prosecution to prove the reliability or origin of the information relayed to Officer Robinson.

ings is a relevant factor, but it does not, as an intervening circumstance, create a sufficient filter between the illegal stop and the statements. *See Taylor v. Alabama,* 457 U.S. 687, 691, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982). In *Taylor,* the defendant was arrested without probable cause and eventually confessed six hours after his arrest. The defendant was given *Miranda* warnings three times and was allowed to visit with his girlfriend and a male companion before confessing. Given this factual situation, the Supreme Court held that the confession was not attenuated from the initial illegal arrest. The Court noted that "[i]f *Miranda* warnings were viewed as a talisman that cured all Fourth Amendment violations, then the constitutional guarantee against unlawful searches and seizures would be reduced to a mere 'form of words.'" *Id.* 457 U.S. at 690, 102 S.Ct. at 2666 (citations omitted).

Again, although we find no misconduct on the part of the police in this case, this factor does not overwhelm the lack of temporal distance and intervening circumstances. The statements were obtained as a direct result of the initial illegal stop and appellant's motion to suppress his post-arrest statements should have been sustained.

## V.

### CONCLUSION

This is a close case, but several near-miss arguments by the State do not add up to a hit. There is no question that the State may have avoided the suppression of evidence by simply calling Detective Himmel to testify at the suppression hearing. And there is a natural temptation to seek to avoid deciding this case on what may appear to be a technical slip-up by the prosecution. However, the prosecution's burden of proof at a suppression hearing is not a technicality; it plays a powerful and integral role in the effort to ensure the effectiveness of the Constitution's Fourth Amendment prohibition against unreasonable searches and seizures. The protection of the citizens' Fourth Amendment rights supersedes any benefit derived from bending the law to secure a single conviction.

We believe this result could have been avoided and need never be repeated so long as the prosecution meets its burden of proof at the suppression hearing. As this standard protects us all without limiting appropriate police investigatory work, it "gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." *Mapp v. Ohio,* 367 U.S. 643, 660, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961).

The incriminating evidence was obtained pursuant to an illegal stop, and neither the consent to search given by Ramona Tope nor appellant's post-arrest statements were sufficiently attenuated from the initial illegality. The trial court should have sustained appellant's motions to suppress. Therefore, the conviction is reversed, and the case is remanded to the trial court for disposition consistent with this opinion.

COVINGTON, C.J., and PRICE and LIMBAUGH, JJ., concur.

HOLSTEIN, J., dissents in separate opinion filed.

ROBERTSON, J., dissents in separate opinion filed and concurs in opinion of HOLSTEIN, J.

BENTON, J., concurs in opinions of HOLSTEIN and ROBERTSON, JJ.

HOLSTEIN, Judge, dissenting.

I respectfully dissent. A more detailed statement of facts leading up to the stop is necessary.

Officers Kevin McDonald, Ed Robinson and Harvey Thomas of the Columbia police department are all assigned to the "Fourth Squad" which works inner-city cases involving drugs and violent crimes. Detective Mike Himmel is in an "intelligence unit" and is involved in the suppression of street level narcotics trafficking. Detective Himmel operates as a plainclothes officer and drives an unmarked vehicle. Among the specific duties of the uniformed officers of the

"Fourth Squad" is the making of stops based upon information supplied by Detective Himmel. The same procedure followed on the date in question had been followed many times before.

On December 27, 1991, Detective Himmel communicated the following information to officer Thomas: a red Nissan Sentra, belonging to a Ramona Tope, with Missouri license plate number VJS976, would be in the vicinity of the Rainbow Village Trailer Court, where Ralph Miller lived, and it would be transporting controlled substances. This information was relayed to other officers of the "Fourth Squad."

Later that same day at approximately 7:15 p.m., officer Robinson observed and stopped a vehicle matching Detective Himmel's description in the Rainbow Village Trailer Court area. Robinson requested backup from McDonald because of the nature of the stop. Robinson expected to find Ramona Tope in the car since it belonged to her. In fact the driver identified herself as Ramona Tope. Defendant was seated in the passenger seat. Officer Robinson explained to Ms. Tope the reason for stopping her vehicle. He asked if he could search both her person and her vehicle. Tope then gave officer Robinson permission for the search.

No doubt exists that if the facts provided by Detective Himmel were shown to be reliable, Robinson had sufficient facts to support reasonable suspicion of criminal activity when he stopped the Tope vehicle. Thus, the sole question here involves the reliability of the information supplied officer Robinson by Detective Himmel.

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), held that, consistent with the Fourth Amendment, police may make an investigatory stop of persons in the absence of probable cause. All that is required is reasonable suspicion that criminal activity is afoot based on articulable facts known to the officer making the stop. *Id.* at 30, 88 S.Ct. at 1884. In addition, law enforcement officers may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *United States v. Brignoni–Ponce*, 422 U.S.

873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

The precise limits on whether there is reasonable suspicion for an investigatory stop are measured by a standard that balances the nature and quantity of the intrusion on personal security against the importance of the governmental interest. *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). It is difficult to imagine a more minimal intrusion of personal security than a police officer stopping a moving vehicle on a public street to ask the identity of its occupants. Against that intrusion one must balance the need for police officers to quickly react to information that illicit drugs are being transported on public highways.

Terms like "articulable facts" and "founded on suspicion" are not self-defining. "[T]he essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). The evidentiary quality and quantity which establishes reasonable suspicion defies mathematical calculus or the scholarly application of the laws of probability. Rather, the test is a product of practical, common sense deductions based on the specific information communicated to or observed by the officer making the stop. *Id.* at 418, 101 S.Ct. at 695.

The scope of the intrusion permitted varies to some extent with the particular facts and circumstances of each case. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). For that reason, factual dissimilarities become highly significant in this area of the law. Indeed, it is extremely easy to extract a "test" from a case that is similar, but not quite like the case at hand, and apply that test without carefully analyzing the facts of the case from which the test is drawn to see if the test makes sense when applied in a different circumstance. Unfortunately, I believe the majority has done just that in this case.

The majority finds the ruling of *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), and reiterated by *State v. Franklin*, 841 S.W.2d 639 (Mo. banc

1992), to be controlling. I disagree with that conclusion.

In *Hensley,* Covington, Kentucky, police officers recalled having read or heard about a flyer issued by St. Bernard, Ohio, police stating, "Hensley was wanted for investigation of an aggravated robbery." 469 U.S. at 223, 105 S.Ct. at 677. The Covington police observed Hensley and made a stop in "objective reliance" on the flyer. However, nothing in the flyer would give a reasonable person cause to suspect that Hensley had committed a crime or was in the process of committing a crime. In order to justify a stop by the Covington police officers, it was necessary to show more information than was disclosed in the flyer, regardless of the reliability of the facts stated in the flyer.

In *Franklin* the police officer who stopped the defendant had received a radio dispatch that a "party armed, occupying a black 1984 Fiero [was] in the area of 4200 East 60th Terrace" in Kansas City. 841 S.W.2d at 640. Again, even if such dispatch is entirely reliable, nothing in that communication would cause a reasonable person to suspect that the occupants of the Fiero had committed or were in the process of committing a criminal act. Unless additional facts were shown, the *Terry* standard was not met.

*Hensley* and *Franklin* apply when one police officer or agency communicates facts to an officer making a stop which are insufficient, regardless of reliability, to give rise to reasonable suspicion that "criminal activity may be afoot." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. Under those circumstances, the reasonable suspicion of the issuing police must be proved to justify the conduct of the officer making the stop. By contrast, the question here does not involve the sufficiency of the information communicated to officer Robinson, but rather the reliability of the source. Reasonable suspicion is based on two factors, the content of the information and its degree of reliability. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412,

2416, 110 L.Ed.2d 301 (1990). As stated earlier, there is no doubt that the content of the facts communicated to officer Robinson were sufficient to give rise to reasonable suspicion *if those facts were given by an objectively reliable source.*

The majority applies the "three-part test" of *Hensley* [1] without analyzing the facts of *Hensley* to ensure that its test is applicable. The issue in this case is one of informant reliability and not sufficiency of the information. The issue of informant reliability was not before the court in either *Hensley* or *Franklin.* For that reason, those cases are not controlling.

The cases that come closest to being controlling authority are *Alabama v. White, supra,* and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). *White* held that information supplied by an anonymous tipster, if corroborated by sufficient indicia of reliability, may justify a *Terry* stop. There the Supreme Court said:

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," . . . that must be taken into account when evaluating whether there is reasonable suspicion.

496 U.S. at 330, 110 S.Ct. at 2416.

In *White* the caller supplied the name of the woman, the particular apartment she would leave from, the time she would leave, the vehicle she would drive, the destination of her trip, and that she would be transporting drugs in a brown attache case. The officers were unable to verify the woman's name or the existence of an attache case. They were also unable to corroborate what apartment she left from, although she did exit the apartment building. The officers were able to corroborate the information regarding both the vehicle and the destination. With respect to the time frame, the caller

---

1. Actually, *Hensley* did not purport to set forth a "three-part test." It merely held that where a police officer makes a *Terry* stop in objective reliance on a police flyer or bulletin, even though the flyer or bulletin contains insufficient informa-

tion to justify the stop, the stop is still valid "if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying the stop." 469 U.S. at 233, 105 S.Ct. at 682.

indicated a time of departure but no testimony confirmed the accuracy of that information. Even so, the court still found it significant that the officers proceeded to the apartment building immediately after the call and the woman emerged "not too long thereafter." *White*, 496 U.S. at 331, 110 S.Ct. at 2416.

Contrary to the majority's assertions, not every detail provided by the informant must be corroborated nor does *White* require that every corroborated fact that existed there exist in every other case. Rather, it stated:

When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

496 U.S. at 332, 110 S.Ct. at 2417.

In *Adams* a known but unnamed informant provided a police officer with information that an individual seated in a nearby vehicle was carrying narcotics and that the individual had a gun at his waist. That information was held to have sufficient indicia of reliability to justify a "stop and frisk." The court noted that reasonable cause for the stop may be based on matters other than the officer's observations. "[W]hen a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response." 407 U.S. at 147, 92 S.Ct. at 1923. The facts making the informant a reliable source were as follows: "The informant was known to [the officer] personally and had provided him with information in the past.... The informant here came forward personally to give information that was immediately verifiable at the scene." *Id.* at 146, 92 S.Ct. at 1923. The Court noted that an informant's unverified tip may be insufficient for a narcotics arrest or search. Nevertheless, the information may carry enough indicia of reliability to justify the officer's forcible stop of the defendant. *Id.*

Here officer Robinson was informed not by an unreliable anonymous tipster but by another police officer. In addition, the other police officer was not just any police officer but one who was in an "intelligence unit" whose job was to gather information about drug trafficking and to relay it to other officers. The same procedure used on the date in question had been used on many other occasions. The information relayed was a description of a specific vehicle, including its make, model and color, the name of the owner, license number, the specific location where the vehicle would be found travelling later that day and that the vehicle would be transporting narcotics. Based on this information, officer Robinson proceeded to the location described. Consistent with all the information supplied by Detective Himmel, he observed a vehicle at the location being driven by a woman. He proceeded to stop the vehicle.

Applying the "totality of the circumstances" test and the reduced indicia of reliability requirement in cases involving a *Terry* stop, we must examine both the quantity and quality of the evidence. The quality of the evidence here is far better than in *White* or *Adams*. The informant here is a known police officer whose specific duties involve gathering information about drug traffic and passing that information along to other police officers. Detective Himmel's procedure in passing along information regarding narcotics traffic to other officers was the same as that previously used on numerous occasions. Under *Adams*, the fact that the informant is known and has provided information in the past further enhances reliability. Like the known informant in *Adams*, Detective Himmel's observations were verifiable by other officers going to the location he described and waiting to see if the Tope vehicle arrived. Finally, as in *Adams*, Detective Himmel was subject to sanctions, both professional and otherwise, if he supplied false information to fellow officers. With a higher quality of the informant, the quantity of information needed to form reasonable suspicion should naturally be diminished.

Without citation to any authority, the majority holds that police officers are conclusively presumed to be unreliable informants unless they testify. I know of no inherent flaw in the character of law enforcement officers that justifies such presumption. A statement made by one police officer to another should be treated no differently than a

statement made by an informant to a police officer. Of course, the state has the burden of going forward with the evidence and the risk of nonpersuasion in determining if the defendant's rights were violated. § 542.296. However, the burden of nonpersuasion and going forward with the evidence should not be translated into requiring the state to prove every conceivable fact that is available. For purposes of appellate review, the state need only establish by *prima facie* evidence that the movant's rights were not violated. Of course, where the record affirmatively shows that the law enforcement officer supplying the information acted illegally or passed along demonstrably unreliable information, as was the case in *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971), an illegal stop cannot be made lawful merely because the officers who make the stop act in objective reliance on the information supplied to them. However, in this case there was no evidence indicating that Detective Himmel acted illegally or that he obtained the information from an unreliable source. Indeed, in this case if Detective Himmel had been merely a reliable informant rather than a police officer, the stop would be held entirely valid even though the informant was unnamed and did not testify.

Even assuming that statements by Detective Himmel should be given no more credence than those supplied by an anonymous tipster, the quantity of the information given here still rises to the level of that found in *White*. Here we have an even better description of the vehicle than in *White*. As in *White*, the record is vague as to the exact time elapsed between when the report was given and when the vehicle was observed. In *White* it was "not too long," while here it was later the same day. We also have a prediction of a future event, which is that the Tope vehicle would be near the Rainbow Village Trailer Court on the date in question. It is important to note that it was not defendant's car but Ms. Tope's car that was in the area where defendant lived. As in *White*, it necessarily took more than a guess or "hunch" to predict that Tope would be driving her car in the area of defendant's home on the date in question. "Significant aspects" of the information supplied by Detective Himmel were corroborated and suggested "a special familiarity with [defendant's] affairs." *White*, 496 U.S. at 332, 110 S.Ct. at 2417.

I am convinced that under the totality of the circumstances test, that is, considering both the quality and quantity of the evidence, the facts reported to officer Robinson had sufficient indicia of reliability to justify the stop to ask the identity of the occupants of the vehicle. The stop was not an unreasonable intrusion into the defendant's personal security.

Once Ms. Tope was identified as the driver, the officers had further verification of Detective Himmel's report. That verification justified a request to search her vehicle and to seek to identify the defendant. The consent to search by Ms. Tope and defendant's furtive activity justified the further searches.

I applaud the majority's altruistic assertion that its holding is designed to ensure the effectiveness of the Fourth Amendment prohibition on unreasonable searches and seizures. However, I am not sure that the application of an arcane "three-part test" for the reasonableness of a police stop, taken from a case which is inapposite, will have the desired effect. The Fourth Amendment prohibits only *unreasonable* searches and seizures. To the extent we read that amendment expansively so as to prohibit a police stop which is, in practical and common sense terms, based on reasonable suspicion, the deterrent effect of the exclusionary rule is rendered meaningless. More importantly, public confidence in core constitutional rights is eroded. To the extent public confidence is eroded, core rights are put at risk.

If there is any good news here, it is that this case is remanded for further proceedings rather than reversed outright. Implicit in that conclusion is that the error was one of admissibility of evidence, not insufficiency of evidence, and that on remand, the state is free to produce any new or additional evidence that may be available. *State v. Wood*, 596 S.W.2d 394, 398 (Mo. banc 1980). A ruling on a motion to suppress is an interlocutory order. *State v. Collins*, 816 S.W.2d 257, 258 (Mo.App.1991); *State v. Fingers*, 585

S.W.2d 203, 206 (Mo.App.1979). Interlocutory orders are always subject to modification or alteration before final judgment. *Brown v. Brown,* 609 S.W.2d 223, 226 (Mo. App.1980). If the trial court in its discretion should determine on retrial that the ends of justice are best served by allowing additional evidence on the suppression of the evidence issue, and the stop of defendant is shown to meet the new test articulated by this opinion, there is no reason why the cocaine should not be admitted in evidence.

I would affirm.

ROBERTSON, Justice, dissenting.

I concur in the dissenting opinion of Judge Holstein. I write separately because I find another basis upon which to affirm the conviction in this case.

*Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), seems to permit introduction of a confession obtained following an unconstitutional arrest if the statements are sufficiently attenuated from the unconstitutional arrest to render the confession the product of free will.

In this case, defendant Miller made several statements after he received Miranda warnings and after he was taken from the scene of the arrest that, taken together, amount to a confession. The latest in time of these attempted to absolve Ms. Tope ("She's innocent. She doesn't know anything about this.") and admitted that he thought all of the cocaine was out of the container.

In *United States v. Ramos,* 42 F.3d 1160, 1164 (1994), the Eighth Circuit stated that where a police officer "was not attempting to exploit an illegal situation" a consent to a search following an unconstitutional detention amounted to "an affirmative waiver of [the defendant's] Fourth Amendment right to prevent a search of his vehicle." That court held that the defendant's "voluntarily signing the consent form was sufficiently an act of free will to purge the taint of the preceding illegal detention." *Id.*

Here the officers clearly informed Ms. Tope that she did not have to consent to the search of her vehicle. Miller makes no suggestion that the officers were "attempting to exploit an illegal situation," to use the words of *Ramos.* The separation in time and location of Miller's statements from the unconstitutional stop, and the making of those statements following his receipt of Miranda warnings was sufficient attenuation to remove the taint, if any, of the stop, and render the statements the product of free will.

"[I]f evidence is improperly admitted, but other evidence before the court establishes essentially the same facts, there is no prejudice to [the] defendant and no reversible error." *State v. Zagorski,* 632 S.W.2d 475, 478, n. 2, (Mo. banc 1982), *citing Harris v. Goggins,* 374 S.W.2d 6, 15 (Mo. banc 1963). With the admission of Miller's statements into evidence, the State established Miller's possession of cocaine. The admission of the actual container of cocaine was, therefore, not prejudicial, the statements alone being sufficient to support the conviction.

I would affirm the conviction.