STATE of Missouri, Plaintiff–
Respondent,

v.

Juan C. RODRIGUEZ, Jr.,
Defendant–Appellant.

No. 19568.

Missouri Court of Appeals,
Southern District,
Division One.

July 20, 1995.

Motion for Rehearing or Transfer
Denied Aug. 10, 1995.

Application to Transfer Denied
Sept. 19, 1995.

Robert D. Lewis, Lewis & Aiken, Spring-field, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Beal, Asst. Atty. Gen., Jefferson City, for respondent.

FLANIGAN, Judge.

The trial court, sitting without a jury, found defendant guilty of trafficking drugs in the second degree, § 195.223,[1] and he was sentenced to five years' imprisonment. Defendant appeals.

Defendant contends that the trial court erred in overruling his motion to suppress 45 bundles of marijuana and other evidence seized by officers from a Dodge van driven by defendant, and statements made by defendant subsequent to the stop, because the challenged items were obtained in violation of his rights under the Fourth and Fourteenth Amendments of the U.S. Constitution, and Art. 1, § 15 of the Missouri Constitution, in that the officer, Sgt. Mike Woods of the

---

1. All references to statutes are to RSMo 1994, V.A.M.S.

Missouri Highway Patrol, had no probable cause to stop the Dodge and seize defendant because Sgt. Woods did not have specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion of the stop and seizure.

In addition to its formal portions, the information charged that on November 10, 1992, in Greene County, the defendant possessed and brought into the State of Missouri more than 30 kilograms of a mixture or substance containing marijuana.

An evidentiary hearing was held on the motion to suppress, and the motion was overruled. Later, the parties stipulated that the evidence offered at the suppression hearing could be considered as part of the trial evidence. The parties also stipulated that the substance the arresting officers found in the Dodge consisted of 167.3 pounds of marijuana. At the trial, defendant renewed his constitutional objections to the challenged items.

The state's witnesses were Sgt. Mike Woods, Cpl. David Henson, interpreter Romeo Barrera, and Trooper Timothy Russett. Defendant testified at the suppression hearing but not at the trial.

The testimony included the following:

## Sgt. Mike Woods

"Since 1987 I have had training in highway drug interdiction and I have made 50 stops that have yielded illegal narcotics. In 10 or 15 cases, I investigated situations where there were alterations to the body of the vehicle. With my training it is easy to detect a vehicle that's been altered.

"On November 10, 1992, I was on duty on I–44 in Greene County, watching for a certain vehicle coming from Oklahoma. I was looking for this vehicle because of a communication, Exhibit 1, from the Oklahoma Highway Patrol. The communications officer at Troop D gave me Exhibit 1, and I had it as I was parked.

"Exhibit 1 reads:

'10:22 11/10/92 00221 MOMHPDD01
TXT
MHP CARTHAGE

CHECK TO OWN SATISFACTION— POSSIBLE DRUG INTERDICTION. TROOPER JERRY LAWSON # 575 JUST RELEASED A GOLD 1985 DODGE VAN WITH IL LIC/WHH724 FROM MILE MARKER 260 EAST-BOUND ON THE WILL ROGERS TURNPIKE. WOULD PUT IT IN MO. IN ABOUT AN HOUR. DRIVER IS A JUAN RODRIGUEZ. TROOPER OBTAINED A CONSENT TO SEARCH, BUT WAS UNABLE TO LOCATE ANYTHING AND NO DOG WAS AVAILABLE AT THE TIME. HE ADVISED THAT IT APPEARS THAT THE BED OF THE VAN HAS BEEN RAISED UP. IF HAVE A DOG AVAILABLE IT MIGHT BE WORTHWHILE TO CHECK THIS VEHICLE WITH A DOG. THE DRIVER HAS KEYS TO IGNITION, BUT NO KEYS TO REAR OR SIDE DOORS AND HAD AIRLINE TICKET WHERE HE FLEW INTO EL PASO, TX, BUT HAS ONLY ONE CHANGE OF CLOTHES WITH HIM. AUTH: TROOPER JERRY LAWSON # 575. DPS VINITA, OKLA. MJG 11/10/92 11:20.'

"I saw a vehicle driving east on Highway I–44 which matched the description in the bulletin. I stopped it at 2:20 p.m. My reason for stopping it was to investigate the stop of the Oklahoma trooper. Cpl. Henson was close by with a dog, so I knew the dog was available.

"Defendant was the sole occupant of the van. He gave me an Illinois driver's license and the vehicle registration. The vehicle had an Illinois tag. Defendant and I discussed the ownership of the van. It was checked to someone else, I don't recall the name. I think Salvadore was either the first or last name. The vehicle was not listed as stolen. Defendant said he was driving the van for that person to Illinois. Defendant said he did not know him.

"Defendant has a heavy accent but I was able to communicate with him. The fact defendant did not know the owner of the van and the person was paying him to drive it, and it was coming from El Paso, a known drug area, and going to Illinois, made me

suspicious of his trip. We have a lot of drug shipments coming from the south going to Chicago. Drug couriers often use other people's vehicles.

"I asked defendant for permission to search his vehicle. He was cooperative and agreed to my searching it. I got out a written consent form. On one side it's in English and on one side it's in Spanish. He filled it out and signed it. I did not threaten him into giving consent. Defendant said he could read Spanish. Before he signed the form, we talked about drugs and whether he was hauling drugs. He denied he was hauling drugs. After obtaining the consent to search, I found two airline tickets in the vehicle.

"I conducted a full search. I called Cpl. Henson and his dog to the scene. While Henson was on the way, I saw some weld marks or torch marks on the undercarriage. I noticed the mounting brackets of the rear seat appeared as if they had been cut and shortened to bring the seat down to accommodate what appeared to be a raised portion of the floor. I was able to see that without getting into the van.

"Henson arrived in a couple of minutes. He must have been already on his way because he was there very shortly. He walked the dog around the vehicle. The dog scratched at the left rear wheel well area on the driver's side, and Henson told me the dog alerted. We entered the van and noticed again that the brackets were cut. I pulled up a piece of carpet and saw a screw hole that a screw was not in. With my flashlight I could see plastic wrapped packages inside that floor area. I punctured a package and it smelled strongly of marijuana. I arrested defendant, read him his rights, and took the van to headquarters.

"My sole reason for the stop was the bulletin. I did not stop the vehicle for speeding. I searched because of his having signed the consent. Under the existing circumstances, the quick availability of the dog, I was not going to release him until I checked to see if there was some kind of dope in the car. I did not enter the vehicle until the dog alerted."

### Cpl. David Henson

"I arrived at the scene at 2:27 p.m. on November 10, 1992. The dog and I have been involved in almost 300 searches for narcotics. I started the dog at the left front corner. When we reached the driver's side rear wheel well, the dog alerted to the odor of narcotics. Sgt. Woods had already told me he had consent to search the vehicle. I was at troop headquarters when the dispatch came in from Oklahoma."

### Interpreter Romeo Barrera

"Spanish is my primary language. I assisted in taking defendant's statement. Exhibit 3 is the consent form signed by defendant for the search."

### Trooper Timothy Russett

"I interviewed defendant with interpreter Barrera. Defendant was advised of his rights in Spanish. Defendant said he was driving the van to Chicago for some friends he met in El Paso. He had known them previously in Chicago. He said he had been given $80, a full tank of gas, three cartons of cigarettes, and a six-pack of Coca Cola to drive the van to Chicago. He was told to park the van anywhere he chose in Chicago and go home and a man would contact him and find out where he left the van. The unused portions of the airline tickets are from El Paso to Chicago. The name on the first ticket is Antonio Esparza and the name on the second ticket is Juan Rodriguez. Defendant said he had known Esparza in Chicago because they had worked for the same company and that Esparza was the one who hired him to drive the vehicle. Defendant said he did not know there was any marijuana in the vehicle."

### Defendant Juan Rodriguez

"I speak a little English. I gave Officer Woods permission to search the car I was driving. I consented because I didn't think I was carrying anything wrong. The persons who gave me permission to drive this car were Jose and another one named Antonio. They told me the van belonged to a man named Salvadore. The Oklahoma trooper,

Lawson, stopped me about 10:30 a.m. on November 10. He stopped me because my van was weaving, and he gave me a warning. He asked for permission to search and I filled out a form, and he got in the van to look around and later gave me my license and said I could go on. I didn't have any keys that would open the side door on the van.

"State's Exhibit 4 is the warning ticket Trooper Lawson gave me. State's Exhibit 5 is the form Lawson filled out. After I signed Exhibit 5, Lawson got inside the van and searched."

Exhibit 4 was a warning ticket issued by Trooper Lawson to defendant for "weaving on roadway." It contains a time notation of 10:26 a.m. Exhibit 5, a consent to search, printed in Spanish and signed by defendant and witnessed by Trooper Lawson, has a time notation of 10:33 a.m.

 Appellate review of a trial court's ruling on a motion to suppress is limited to a determination of sufficiency of the evidence to sustain the trial court's finding. *State v. Villa–Perez,* 835 S.W.2d 897, 902[9] (Mo. banc 1992). "[I]n so doing, we examine all circumstances and the total atmosphere of the case, and defer to the trial court's vantage point for assessing the credibility of the witnesses and weighing the evidence." *Id.* "Only if the trial court's judgment is clearly erroneous will an appellate court reverse." *State v. Milliorn,* 794 S.W.2d 181, 183[5] (Mo. banc 1990). If the trial court's ruling "is plausible in light of the record viewed in its entirety," this court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 184. Where, as here, there is no factual dispute, determination of the reasonableness of a search, under the Fourth Amendment, is a question of law. *U.S. v. Walker,* 941 F.2d 1086, 1090[3] (10th Cir.1991); *U.S. v. Pena,* 920 F.2d 1509, 1513–1514[2] (10th Cir.1990); *U.S. v. Arango,* 912 F.2d 441, 444 (10th Cir. 1990).

At the hearing on the motion to suppress, the state has the burden of showing by a preponderance of the evidence that the motion should be overruled. § 542.296.6; *State*

*v. Franklin,* 841 S.W.2d 639, 644 (Mo. banc 1992); *State v. Pate,* 859 S.W.2d 867, 870[2] (Mo.App.1993).

"The Fourth Amendment of the United States Constitution preserves the right of the people to be secure against unreasonable searches and seizures. Generally, a search or seizure is allowed only if the police have probable cause to believe the person has committed or is committing a crime. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The Fourth Amendment allows, however, a so-called *Terry* stop, which is a minimally intrusive form of seizure or 'semi-arrest' that is lawful if the police officer has a reasonable suspicion supported by articulable facts that those stopped are engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Police are allowed to conduct *Terry* stops of moving vehicles upon a reasonable suspicion that the occupants are involved in criminal activity. *United States v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). The permissible scope of a *Terry* automobile stop includes a 'search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden.' *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983)."

*State v. Miller,* 894 S.W.2d 649, 651–652[1, 2] (Mo. banc 1995).

The unusual feature of this case is that it involves the constitutionality of a second stop of a vehicle. Cases dealing with that situation include *U.S. v. Garcia,* 23 F.3d 1331 (8th Cir.1994) and *U.S. v. Peters,* 10 F.3d 1517 (10th Cir.1993). In each, the second stop was held unconstitutional. See also *United States v. Morin,* 665 F.2d 765 (5th Cir.1982) (airline passenger stopped twice—second stop held to be an unlawful arrest).

In *Garcia,* defendants were convicted of possession of cocaine. The first stop of defendants' rental truck was made by Trooper Schenck, who observed the truck moving erratically on I–80 in Nebraska. Suspecting the driver might be impaired, Schenck

stopped the vehicle and interrogated the two defendants.

Defendants denied having any narcotics or weapons. One of them asked the officer, "Would you like to look?" and Schenck said he would. The door to the cargo compartment was unlocked by one of the defendants, and Schenck observed that it was loaded with furniture boxes and there was no visible luggage or clothing. The defendants said they were moving to El Paso. Schenck requested a check with El Paso authorities, but let the defendants proceed on their way before he received a response. The first stop lasted between seven and ten minutes.

Shortly after Schenck permitted defendants to leave, El Paso authorities informed him that one of the defendants had been arrested on a firearms violation. Schenck then asked his dispatcher to send him assistance and a drug trained dog, and requested that another trooper intercept the truck.

The truck was stopped by a second trooper 30 miles west of the original stop. Schenck arrived six or seven minutes later and asked defendants if they remembered giving him permission to search the truck and if he still had that permission. Receiving an affirmative response, Schenck searched the cab and found cocaine.

The court said that the first stop was constitutional, in that Schenck had seen the truck swerve from the roadway three times, a violation of Nebraska law. Observation of a traffic offense, however minor, gave him probable cause to stop the vehicle.

The court said that the second stop was not based on a violation of traffic laws but was a straightforward investigatory stop. The court said it was difficult to perceive the connection between driving a rented truck full of furniture in Nebraska and drug trafficking, and that the fact that defendants were Mexican and spoke Spanish did not support a reasonable suspicion of criminal activity. The court said that although there is no per se prohibition against successive investigatory stops, the second stop is often inherently more intrusive and coercive than the first. At 1335–1336 the court said:

"This case is somewhat peculiar because Schenck obtained most of the facts on which the state relies to support the second stop during the original traffic stop and aborted search of the appellants' truck. *The only fact which Schenck learned after he aborted his original search and before he stopped the appellants for a second time was that Garcia had a prior arrest on a firearms violation. Even with this additional piece of information, we hold that all of the facts taken together did not create a reasonable, articulable suspicion that the appellants were engaged in illegal activity.*

"The evidence of drug commerce that the state obtained during the unconstitutional second stop of the appellants' rental truck was tainted by the unlawful seizure. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." (emphasis added).

In *Peters,* defendants, both of Nigerian ancestry, were convicted of unlawful possession of identification documents and false representation of citizenship. The first stop of defendants' rental truck was made in Flagstaff, Arizona, by Officer Martin, who observed the vehicle weaving across the center line. Defendants told Martin they were moving from California to Dallas. A computer check of their drivers' licenses showed no irregularities. Defendants were nervous, and Martin suspected they were hauling drugs. He requested a drug-sniffing dog, but none was available. Defendant Peters signed a consent form for Martin to search the truck. He did so, and found no evidence of drugs or other illegal activity. He permitted defendants to go on their way.

Martin testified he was not satisfied with his search because of the unavailability of a dog and because he had not searched the truck as thoroughly as he would have liked. He told his superior that he continued to suspect drug activity. The matter was referred to Agent Ochoa at a border patrol station in Albuquerque, New Mexico.

Ochoa intercepted defendants' truck and requested back-up support and a drug-sniffing dog. As Ochoa pulled alongside the truck, he observed both defendants looking

straight ahead. Ochoa stopped the truck and searched it. He obtained consent to examine the wallet of one of the defendants, which contained a counterfeit social security card. A thorough search of the vehicle revealed false identification documents which had been hidden in a suitcase.

The court said the issue was whether Agent Ochoa had an objective and particularized basis for his suspicions that was reasonable and sufficient to justify the second stop. The government argued that Ochoa had grounds for a reasonable suspicion of criminal activity because Ochoa knew the suspects were of Nigerian ancestry, the truck made an abrupt lane change while Ochoa was following it, Ochoa had been informed the defendants acted "nervous" in Flagstaff, and the defendants exhibited nervous behavior while Ochoa drove alongside their truck.

The court said that at the first stop the license check seemed to confirm defendants' status as students from Nigeria legally residing in the United States. The court said, at 1521[2]:

"The contents of the truck corroborated their story that they were students moving across country. There was no factual basis, other than an inarticulable hunch developed by Officer Martin, to suspect that the defendants' statements were not completely accurate. Indeed, nothing in the record up to this point casts any doubt upon their explanation. *The results of the initial stop in Flagstaff, without any new information, dispelled any reasonable suspicion of illegal activity as a matter of law.*" (emphasis added).

The court said that the lane change, although abrupt, was legal and did not afford reasonable suspicion of an immigration violation. At 1522[7–9] the court said:

"Moreover, nervous behavior had already been exhausted as a ground to support a second stop by Officer Martin or another officer who had been contacted by Officer Martin. According to *Terry,* when an officer observes 'unusual conduct which leads him reasonably to conclude ... that criminal conduct may be afoot,' he may perform an investigation as long as 'nothing in the initial stages of the encounter

serves to dispel' his fears and suspicions. *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. *Similarly, the Supreme Court in United States v. Place, 462 U.S. 696, 717, 103 S.Ct. 2637, 2649, 77 L.Ed.2d 110 (1983), held that if probable cause is not developed during a Terry-type encounter, the officer must release the suspect. This is the case because when reasonable suspicion has been dispelled or probable cause has not developed, the conduct upon which the officer originally based his suspicions has proved to be an illusory ground for suspicion under the particular circumstances, and thus, has been exhausted. Being illusory, the ground no longer reasonably supports a continuation of the search. Absent a new and independent basis for suspicion, the officer must halt his investigation in accordance with Terry and Place.*

"Of course, a second officer who is unaware of the fruitless search conducted earlier may initiate his own investigation based on the same 'suspicious' behavior that was exhausted by the first officer's failed investigation. *The officer who performed the original investigation, however, may not release the suspect as required by Terry and Place, wait until he has travelled down the road a few miles, and then make a second Terry stop based solely on the conduct that has already proved to be illusory. Similarly, the officer cannot circumvent Terry and Place by calling upon a different officer to make the second intrusion in his stead.*" (emphasis added).

At 1522–1523 the court said:

"Having no grounds upon which he could continue to detain the suspects, Officer Martin allowed them to continue on their way. At this point, nervous behavior had been exhausted as a ground for suspicion, and thus, it would have been unreasonable for Officer Martin to have stopped the suspects again a few minutes later based solely on a claim that they were once again acting nervous in his presence. Likewise, it would contravene the teachings of *Terry* and *Place* to allow Agent Ochoa to make the second stop based on nothing more than the information provided him about

Officer Martin's encounter and a repeat occurrence of the same 'suspicious' conduct that Agent Ochoa knew had proved illusory at the earlier stop. Thus, we hold that even if the suspects had acted nervous in Agent Ochoa's presence prior to the second stop, nervous behavior could not reasonably have served as the sole basis for his suspicion under the facts of this case.

"In sum, there is no basis in the record to support the government's claim that Agent Ochoa made the Albuquerque traffic stop on reasonable suspicion. We hold that the second stop of Mr. Peters and Mr. Ayinde violated the Fourth Amendment as a matter of law."

The court also held that the incriminating statements and consents to search were tainted by the second stop because the defendants were not advised of their Miranda rights prior to making the statements and giving consents, the statements and consents were obtained just moments after the second stop, there were no intervening causes, and Agent Ochoa's conduct bordered on harassment. At 1523 the court said: "Acting solely on an unsupported, inarticulable 'hunch' supplied by another officer, after the suspects have already been exonerated by a previous investigation, is flagrant misconduct under the Fourth Amendment."

In *McKnight v. State*, 612 N.E.2d 586 (Ind. App.1993), the constitutionality of a second stop was upheld, where additional information had been obtained by the arresting officer between the two stops. That additional information gave rise to reasonable suspicion that the defendant had committed an offense and the court said "this suspicion was independent of the initial stop."

Although not a second stop case, *Kaiser v. State*, 296 Ark. 125, 752 S.W.2d 271 (Ark. 1988), is instructive. Defendant was found guilty of possessing marijuana on his person. Defendant's car was stopped by Arkansas officers who had received information from Missouri officers that defendant would be traveling through Randolph County, Arkansas, in a described vehicle, and that he was carrying "a pistol and $25,000 cash or 50 pounds of marijuana." The sole basis for the Arkansas stop was information received from

Missouri officers who said that their information came from a reliable informant. There was no showing of the identity or the reliability of the informant. Citing *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the court said, 752 S.W.2d at 274:

"[T]he failure of the issuing police agency to have reasonable suspicion to stop and search a vehicle cannot be immunized from a Fourth Amendment objection by passing the information on to another police officer or department which then acts upon it. In this case, the informant may well have been a reliable one, and the Missouri State Police may well have had a reasonable suspicion of Kaiser. We cannot know that, however, as the record is devoid of testimony supporting that conclusion."

This court holds that the second stop was violative of defendant's rights under the Fourth and Fourteenth Amendments. It was based solely upon the Oklahoma trooper's hunch that the van might contain contraband. "The requirements of reasonable suspicion and probable cause would be rendered meaningless if police could simply filter a 'hunch' through a radio dispatch or cellular phone and have it come out reliable on the other end." *State v. Miller*, 894 S.W.2d 649, 653 (Mo. banc 1995).

A search is not to be made legal by what it turns up. It is good or bad when it starts, and success does not change its character. A statement obtained as a result of an illegal stop cannot be used to establish the legality of the stop. *Id.*

In *Miller*, at 654–656, the court discussed the attenuation doctrine and enunciated the following principles: Generally, evidence derived from a Fourth Amendment violation must be excluded as fruit of the poisonous tree. The question is whether, granting establishment of the primary illegality, the challenged evidence "has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." The voluntariness of a consent to a search is important, but it is merely a threshold requirement for the attenuation doctrine. The government

must meet the dual requirements of voluntariness and sufficient independence from the prior illegality to purge the taint of that illegality. In determining whether to suppress evidence, obtained through a voluntary consent to search given after an illegal stop or arrest, and in determining whether to suppress a confession obtained after an illegal stop or arrest, three factors should be considered: (1) the temporal proximity of the illegality and the search or confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.

In *Miller*, the court found the consent to search, although voluntary, tainted by the illegal stop, where there was no significant time interval between the stop and the consent. "[O]nly moments, or at most minutes," separated the stop and the consent to search. The court cited federal cases where the consent to search was held to be tainted although approximately one hour had elapsed between the unlawful stop or arrest and the consent. The court pointed out that there were no intervening circumstances occurring between the stop and the consent, and that the mere fact that the person detained was told she would not be arrested for refusing to consent was not an intervening circumstance serving to remove the taint. Finally, the court found no police misconduct, but added, "the absence of purposeful and flagrant misconduct cannot alone dissipate the taint in the complete absence of temporal distance and intervening circumstances."

The state offered no evidence as to the hour at which Russett's interview of defendant on November 10, 1992, took place. In *Miller*, the court suppressed defendant's post-arrest statements, given after he had received the Miranda warnings, as tainted by the illegal stop. The court said the fact that defendant was given the Miranda warnings was a relevant factor "but it does not, as an intervening circumstance, create a sufficient filter between the illegal stop and the statements." The court cited *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), where a confession was suppressed as tainted by an illegal arrest, although the confession was made six hours after the arrest. During the six hours, defendant was given the Miranda warnings three times and was permitted to visit with his girlfriend and a male companion. The taint of the illegal arrest was not attenuated.

*Miller* is instructive on one more feature. The court rejected the state's argument that the seized cocaine was in plain view after the officers received the consent to search the car. The court said, at 656: "Because we have held that the consent did not render the initial illegality irrelevant and did not dissipate the taint of the initial illegality, the plain view doctrine does not apply in this case. The plain view doctrine only applies where the officer is lawfully located in a place from which the object can be plainly seen, the officer has a lawful right of access to the object itself, and the incriminating character of the object is immediately apparent to the seizing officer. Officer McDonald was not lawfully located in a place where he could plainly see the container." (citation omitted).

 This court holds that the second stop of the Dodge violated defendant's rights under the Fourth and Fourteenth Amendments, that the consent to search the vehicle and the consent to be interviewed were tainted by the unlawful stop, and that the trial court clearly erred in denying defendant's motion to suppress the fruits of the search and defendant's statements. With the elimination of the challenged items, the evidence is insufficient to support the conviction.

The judgment is reversed and the defendant is ordered discharged.

SHRUM, C.J., and MONTGOMERY, J., concur.