STATE of Missouri, Appellant,

v.

Matthew J. ROBERTS, Respondent.

No. WD 53965.

Missouri Court of Appeals, Western District.

Submitted Sept. 4, 1997.

Decided Nov. 18, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1997.

Application for Transfer Denied Jan. 27, 1998.

Ted R. Hunt, Asst. Pros. Atty., Jackson County, Kansas City, for appellant.

Laura E. O'Sullivan, Asst. Public Defender, Kansas City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

SMART, Judge.

This appeal is before us as an interlocutory appeal by the State of the granting of a motion to suppress evidence. The State takes this appeal pursuant to § 547.200.1(2), RSMo 1994 [1], which provides that an appeal may be taken by the State "from any order or judgment the substantive effect of which results in . . . suppressing evidence."

Matthew J. Roberts is charged with one count of felony animal abuse, § 578.012, and, in the alternative, with one count of misdemeanor animal abuse, § 578.012. At the conclusion of a pretrial hearing on Roberts' motion to suppress, the trial court ordered certain items of evidence suppressed. The State contends that the trial court erred in granting Roberts' motion to suppress because the conduct of police, in entering areas of Roberts' duplex, was justified as a lawful security sweep incident to Roberts' arrest. The State further claims that the search was justified under the exigent circumstances exception to the search warrant requirement of the Fourth Amendment. Because we agree with the State's contention that the conduct of the police was justified as a protective security sweep incident to Roberts' arrest, we reverse the trial court's order suppressing a garden hose, a strip of carpeting with red stains on it, pictures of the walls and floors outside of the bedroom showing bloodstains, and a pair of men's boxer shorts.

On the evening of February 18, 1996, at 9:00 p.m., David Hooper, Roberts' neighbor in a one-level duplex, heard the sound of a dog being beaten with some type of hollow object. The sound continued for an hour. Mr. Hooper left the duplex to run to Quik Trip. As he returned, he observed through Roberts' window that Roberts was laying face down on his couch. Roberts' sweat pants were partly down and he appeared to be engaged in a struggle, twisting side-to-side, and up-and-down. Mr. Hooper entered his duplex. He thought that he heard the dog cry a couple more times. Roberts came over and beat on Mr. Hooper's door. Roberts told Mr. Hooper that he thought that he had killed his dog. Roberts was hysterical.

Mr. Hooper observed that Roberts was shirtless, sweaty and had blood on his skin and on his pants. Mr. Hooper saw the body of the dog in the front yard. As Mr. Hooper attempted to check on the condition of the dog, he noted that it "sounded like he was breathing his last breath." Mr. Hooper left and returned to Quik Trip where he called 911.

Mr. Hooper returned to the duplex and informed Roberts that he had called 911. Roberts became angry and told Mr. Hooper that he wasn't "going back to jail." Roberts dragged the body of the dog into his residence.

At approximately 12:30 a.m., Officer Charles Iseman received a dispatch advising him that there was a white male with blood on his shirt, screaming that he needed help. Officer Iseman and Sergeant Rick Schopfer contacted Mr. Hooper, who told them what he had seen and heard. Mr. Hooper told them that Roberts had been beating his dog and that he thought Roberts had killed the dog. He also told them that Roberts lived alone, that he was unsure whether Roberts had been injured and that he believed that Roberts was still inside his residence. The police knocked upon Roberts' door, identifying themselves as police officers. There was no response. There were no lights on at the residence. The officers went to the west side of the duplex and shined their flashlights through the windows. They did not observe anyone inside.

Officer Iseman checked the rear door to the duplex. Finding it unlocked, he partially opened the door but was stopped by the security chain. Peering inside with the aid of flashlights, the officers noticed a tan colored dog lying motionless on the floor. The officers forced the door open. Upon getting a closer look at the dog with his flashlight, Officer Iseman noted that it appeared to be dead. Its hair was matted around the head area and fecal matter was smeared on its hindquarters. Roberts then appeared in the rear bedroom in which they had made entry. He had no shirt on and his pajama bottoms had brown stains on the front portion of the legs. The officer asked if he was okay. In

---

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

reply to the officer's query, Roberts told the officer that he was okay but that his dog was dead. Officer Iseman asked Roberts what happened to the dog, and Roberts stated that he was "squeezing it, and it made a funny sound, and it died." The officer testified that at that point he did not know whether there were any other people in the house, or whether there were any weapons accessible to Roberts. Officer Iseman handcuffed Roberts. Officer Iseman testified that at that point they needed to "secure the scene" because they did not know if there were "other parties injured or possible suspects inside." They left Sergeant Schopfer in the room with Roberts while Officer Iseman and Officer Anthony Hunter conducted a "protective sweep" of the residence. Officer Iseman testified that they were checking for other injured parties or anyone that could be a threat to the officers. The duplex was a small single bedroom duplex. The residence consisted of the rear bedroom, the bathroom, an interior closet, interior hallway closet, a bathroom, and a front living room open with the kitchen.

Officer Iseman said it was a systematic sweep for any persons inside. Iseman went first, with Hopkins behind him. They first reached the interior hallway closet, which was about seven to eight feet from where Roberts was at that point. The door was partly open. Iseman shined his flashlight in the closet. There was no one in the closet. He noticed a garden hose on the floor of the closet, smeared with something. The officers then checked the bathroom. No one was in the bathroom. In the living room, the officers observed a marijuana plant which, they said, they had also observed from outside the duplex when they shined their flashlights in. The "sweep" being essentially completed, the officers went back to the bedroom and informed Roberts that he was under arrest for possession of marijuana. At that point, they noticed that Roberts appeared to be upset about the animal, which was lying near him. They escorted Roberts out of the room to the living room couch. They turned on the lights in the room in order that there be some illumination in the house beyond their flashlights. The officers observed a pair of brown underwear shorts with brown fecal matter on

them, directly to the right of where Roberts was seated on the couch. A few feet behind where the defendant was sitting were some splatters on the hallway wall which appeared to be blood splatters. To the left in the adjoining kitchen area, Officer Iseman observed what appeared to be blood on the linoleum floor. At that point, the officers began to collect some of the evidence they had already seen. Returning to the hall closet, an officer seized the garden hose. He also seized a stained carpet strip which he found when he retrieved the garden hose. The officers also seized the marijuana plant, a pair of boxer shorts, and the body of the dog. Two of the officers transported Roberts to the station for booking, and Sgt. Schopfer arranged for a camera to be brought to the scene for recording the evidence.

Roberts was charged with one count of felony animal abuse, § 578.012, and alternatively with one count of misdemeanor animal abuse, § 578.012. He moved to suppress the physical evidence obtained during the search of his residence on the ground that the search violated the Fourth Amendment to the United States Constitution, Art. 1, § 15 of the Missouri Constitution, and § 542.261. In his motion, Roberts asked the trial court to suppress the items seized in the search, the garden hose, carpet strip, marijuana plant, boxer shorts, splatters, and the body of the dog. Roberts also asked the court to suppress the results of the necropsy examination performed upon the dog's body and a statement that Roberts made to the police following his arrest. After a hearing, the trial court ordered the suppression of the garden hose, the strip of carpeting, the pair of boxer shorts, and pictures of the walls and floors outside of the bedroom. The trial court, in its analysis, found that the exigent circumstances justified the forced entry without a warrant. However, the court reasoned, once the officers placed Roberts in handcuffs, there were no further exigent circumstances justifying any officer in looking around the house. Further, the court did not believe the officers were justified in conducting a "protective sweep" because the officers had no

information that anyone else was in the house.

The State appeals the order suppressing the evidence.

■ The State contends that the trial court erred in sustaining the motion to suppress because the seizure of this evidence was justified as a security sweep incident to Roberts' arrest. The State further argues that the search of the duplex was justified under the exigent circumstances exception to the search warrant requirement of the Fourth Amendment.

■ In our review of the trial court's ruling on a motion to suppress, this court is limited to determining whether there is sufficient evidence to sustain the trial court's finding. *State v. Villa–Perez*, 835 S.W.2d 897, 902 (Mo. banc 1992). Review is performed under an abuse of discretion standard. *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo. banc 1990). We will reverse only if the trial court's judgment is found to be clearly erroneous. *Id.* If the ruling is "plausible in light of the record viewed in its entirety" this court will not reverse even if we are convinced that had we been the trier of fact we would have weighed the evidence differently. *Id.* at 184. Where there is no factual dispute, the reasonableness of the search is a question of law. *State v. Rodriguez*, 904 S.W.2d 531, 534 (Mo.App.1995).

■ The Fourth Amendment of the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no war-

rants shall issue but upon probable cause, supported by oath or affirmation, and particularity describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment protects an individual only from those searches and seizures that are unreasonable. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In making the determination as to reasonableness, the intrusion on an individual's Fourth Amendment interests is balanced against the legitimate interests of the government in conducting the search. *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093, 1096–97, 108 L.Ed.2d 276 (1990).

A warrantless search is presumptively invalid; the burden rests with the State to prove that justification for such a search existed. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such justification recognized as an exception to the warrant requirement is the existence of exigent circumstances. For example, it is permissible to enter a home without a warrant in an emergency situation in response to a need for help. *State v. Butler*, 676 S.W.2d 809, 811 (Mo. banc 1984).

The trial court found that the initial entry into Roberts' home was justified because of exigent circumstances. Roberts does not take exception to that portion of the trial court's ruling.[2]

The trial court, in its suppression order, concludes that once the police officers had discovered the body of the dog, the exigent circumstances justifying the initial entry ceased to exist. We need not resolve the

---

2. Missouri has not addressed the application of the emergency exception to the warrant requirement in cases that involve an animal's welfare. Courts in other jurisdictions have, however, applied this exception to such situations. For instance, in *Tuck v. United States*, 477 A.2d 1115 (D.C.App.1984), police officers responding to a cruelty to animals complaint observed several suffering animals in a closed unventilated display window on a day where the temperature had reached 103 degrees. Police officers entered the window to remove a rabbit when the owner of the store refused to do so. *Id.* at 1117. The rabbit was visibly suffering, and was subsequently diagnosed as suffering from heat stroke. *Id.*

The court held that the exigent circumstances exception to the warrant requirement applied to the seizure of the rabbit. In *State v. Bauer*, 127 Wis.2d 401, 379 N.W.2d 895, 899 (Wis.App. 1985), the court, observing that cruelty to animals is a statutory offense and that state policy is to render aid and protection to vulnerable and helpless animals, found that "[t]he exigent standard test applies to situations involving the mistreatment of animals." *See also Suss v. American Society for Prevention of Cruelty to Animals*, 823 F.Supp. 181 (S.D.N.Y.1993); *People v. Thornton*, 286 Ill.App.3d 624, 222 Ill.Dec. 60, 676 N.E.2d 1024 (1997).

issue of whether the trial court erred in finding that any exigent circumstances ceased upon the discovery of the body of the dog, because the issue of the legitimacy of the officers' actions is governed by *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

In *Buie*, following the armed robbery of a pizza restaurant by two men, one of whom was wearing a red track suit, an arrest warrant was issued for Buie and for his suspected accomplice in the robbery. *Id.* at 328, 110 S.Ct. at 1095. The police went to Buie's house to execute the warrant. Buie was in the basement. When he emerged he was arrested, searched and handcuffed. One of the police officers went to the basement to determine whether there was anyone else there. *Id.* The officer observed a red running suit lying in plain view on a stack of clothing. He seized the suit and it was introduced by the State at trial. *Id.*

Buie filed a motion to suppress which was denied by the trial court. *Id.* at 329, 110 S.Ct at 1095–96. The Maryland Court of Appeals reversed, finding that there must be probable cause to believe that a "serious and demonstrable potentiality for danger exists." *Id.* The Court of Appeals found that the State had not satisfied the probable cause requirement. *Id.* The United States Supreme Court, however, held that Maryland had applied an unnecessarily strict standard. *Id.* at 336, 110 S.Ct. at 1099. The Supreme Court concluded that the Fourth Amendment allows law enforcement officers to carry out a limited protective sweep of a residence to protect themselves. *Buie*, 494 U.S. at 334, 110 S.Ct. at 1098. To this end, the court held "that as an incident to the arrest the officers could, as a precautionary matter and *without probable cause or reasonable suspicion*, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* (emphasis added). The court in *Buie* made clear it was not condoning a search from top-to-bottom of a private residence. The protective sweep described by the *Buie* court is limited to "a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. at 1099.

For any warrantless search beyond this limited protective sweep, an officer must have a reasonable belief, based upon specific and articulable facts, that the area to be examined conceals a person posing a danger to those present. *Id.* at 334, 110 S.Ct. at 1098. The rationale for a protective sweep is explained by the court, which states:

> The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open familiar surroundings.

*Id.* at 333, 110 S.Ct. at 1098.

In this case, the issue is whether the areas searched adjoin the place where Roberts was arrested, and whether they were places from which an attack could have been immediately launched. The resolution to this question is, necessarily, fact specific. *See United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995). Although the phrase "immediately adjoining the place of arrest from which an attack could be immediately launched" is not defined in *Buie*, other courts have interpreted the phrase as including rooms directly adjacent to the place of arrest. *United States v. Harris*, 629 A.2d 481, 494 (D.C.App. 1993). In *Harris*, the search of the defendant's bedroom was held to be lawful on the grounds that the bedroom was a space immediately adjoining the place of arrest, the hallway. *Id.*

The duplex in this case was a small, single level, single bedroom duplex which measured, from front door to back door and from side to side, approximately twenty-five feet. The duplex consisted of the rear bedroom, the bathroom, an interior closet, interior hallway closet, and a front living room open with

the kitchen. Officer Iseman estimated that it would take about ten seconds to walk from one side of the house to the other.

Officer Iseman and Officer Hunter initially looked into the hall closet immediately adjacent to the bedroom at a distance of approximately seven to ten feet, some two to four steps from Roberts' location. The closet was large enough to have concealed at least one person. The bathroom adjoining the bedroom was checked. The adjoining kitchen and living room areas, approximately fifteen feet away from Roberts, were checked. Every place checked was capable of physically accommodating a human being. The sweep itself was of short duration, lasting from twenty-five to thirty-five seconds.

The officers who searched Roberts' duplex did not need specific and articulable facts that would support a reasonable belief that they were in danger from an individual on the premises before they could lawfully conduct the sweep. This is unnecessary under the first type of search authorized in *Buie.* In *Harris,* for example, the court upheld a protective sweep that included a bedroom after the suspect had been apprehended in the hallway as he was leaving his bedroom. *Id.* at 484. The court explained:

> It is true that the police had no actual evidence that a possible attacker would be in this room. They had already apprehended Harris himself, and there was no evidence that any accomplices had been involved in the Park Road shooting. The only indication that anyone else might have been there was the thump heard by Officer Bailey, but this had occurred before Harris left the bedroom, and Bailey attributed the noise to Harris's dropping a gun. Nevertheless, even though the police may not have had any factual basis for believing that anyone else was in the bedroom, they were entitled under *Buie* to make a protective sweep of the room as a reasonable, general precaution because it immediately adjoined the place of arrest.

*Id.* at 494.

The sweep in the instant case complied with the standards established in *Buie:* (1) the search covered those areas immediately adjacent to Roberts' bedroom; (2) the search

was quick, lasting only twenty-five to thirty seconds; (3) the search was limited to those areas where a person could have been hiding, i.e., closets, the bathroom, and other living spaces. There was no evidence that the search exceeded the permissible scope of a protective sweep. It follows, therefore, that the items discovered during the sweep and seized by the officers should not have been suppressed by the trial court. *See United States v. Lauter,* 57 F.3d 212, 217 (2d Cir. 1995). Because of our holding that the protective sweep was lawful, we need not address the State's other arguments for reversing the order of suppression.

Accordingly, the trial court's order suppressing the garden hose, the strip of carpeting, the boxer shorts and the photographs showing blood stains, is reversed.

LOWENSTEIN and LAURA DENVIR STITH, JJ., concur.